IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MP TotalCare Services, Inc.
       *d/b/a* CCS Medical, Inc.,                       Case No. 3:08CV885

          Plaintiffs

     v.                             ORDER

Tricia Lynn Mattimoe, et al,

          Defendants

This is a case about contract enforceability. Plaintiff, MP TotalCare Services, Inc. [MP] alleges that its former employee, defendant Tricia Lynn Mattimoe, breached non-compete, non-solicitation and confidentiality clauses in her employment contract by entering into an employment relationship with defendant Healthtronix Lymphedema Management [Healthtronix]. In addition to breach of contract, MP sues defendants for: 1) misappropriation of trade secrets; 2) unjust enrichment; 3) tortious interference with business relationships; 4) tortious interference with a written contract; and 5) inevitable disclosure.

Jurisdiction exists under 28 U.S.C. § 1332. Pending is defendants' motion for summary judgment [Doc. 21]. For the reasons discussed below, defendants' motion is granted in part and denied in part.

1

## Background

MP is a wound care supplier which provides wound care consultants to hospitals and clinics. In the wound care industry, suppliers enter into letters of understanding with hospitals and clinics authorizing them to provide on-site wound care supplies to patients. Wound care providers, therefore, think of hospitals and clinics as customers.

Gericare Providers, Inc., the predecessor company to MP, hired Mattimoe on August 15, 1997, to work as a patient educator. Mattimoe received various promotions, and in January, 2006, she became vice president of sales. In this position, she was one of two employees responsible for managing MP regional sales managers. In September, 2006, MP eliminated this position and transferred Mattimoe laterally to the position of clinical services manager.

As clinical services manager, Mattimoe worked directly with wound care centers throughout the country, including McKees Rocks, Pennsylvania, Portsmouth, New Hampshire and Youngstown/Warren, Ohio.[1] She also provided advanced training to MP employees and recruited new employees.

On January 30, 2007, Mattimoe signed a confidentiality, non-solicitation and non-compete agreement with MP. The agreement stated:

> 3. Confidentiality and Return of Materials:  (b) Employee shall not use or disclose any Trade Secrets of Employer during Employee's employment and for so long afterwards as the pertinent information or data remain Trade Secrets, whether or not the Trade Secrets are in written or tangible form, except as required to perform Employee's duties for Employer  .   .   .  Employee shall not use or disclose any Confidential Information of Employer during Employee's employment, or for a period of eighteen (18) months after the end of the his or her employment for any reason, except with the written consent of Employer or as otherwise required by law.

---

[1]

For MP's purposes, it considered the clinics in Youngstown, Ohio and Warren, Ohio, to be one consolidated clinic. As such, I refer to this clinic as Youngstown/Warren.

2

\* \* \*

4. <u>Non-Solicitation of Employees:</u> Employee shall not, without the express written consent of the Employer for employment with any employer other than Employer, directly solicit or recruit, or attempt to solicit or recruit, another employee of the Employer for employment with any employer other than Employer, directly or by assisting others, or attempt to persuade or induce any other employee of Employer to leave his or her employment with Employer during Employee's employment with Employer and for a period of twelve (12) months thereafter.

\* \* \*

5. <u>Non-Interference with Customer Relations:</u> Employee also expressly acknowledges that it would be unfair and inappropriate for him or her to attempt to promote on behalf of anyone other than the Employer, any of those products or services to any client that he or she has served on behalf of the Employer. Consequently, during Employee's employment with Employer and for a period of eighteen (18) months thereafter, Employee expressly covenants that he or she shall not solicit or attempt to solicit, directly or by assisting others, without the express written consent of the employer, similar home medical equipment or home medical supply business from clients that Employee had served on behalf of Employer.

\* \* \*

7. <u>Non-Compete</u>: Employer expressly covenants and agrees that during Employee's employment with Employer, and for a period of eighteen (18) months thereafter, he/she will not, without the express written consent of the Employer, for any reason whatsoever, directly or indirectly, for himself/herself or on behalf of or in conjunction with any other person(s), company, partnership or corporation, compete with the Employer by working in the "Employee's Sales Area" as a salesperson, marketer, sales or marketing consultant or as a manager, officer, partner, joint venture, owner or shareholder for any entity that sells or supplies (enter very detailed description)_____
_____

For purposes of the foregoing restriction, the "Employee's Sales Area" is defined as the following State of _____ Counties, in which Employee expressly acknowledges that he/she performs sales activities on behalf of Company:

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____

3

Mattimoe completed this contract, noting that her sales area was the "USA." [Doc. 27, Ex. 3].

On April 30, 2007, Mattimoe resigned from her position at MP. She started to work for TLC HomeCare, and continued to look for another position in the wound care field.

In Summer, 2007, Mattimoe contacted Cheri Hoskins, the president of Healthtronix and personal friend, to discuss her job search. Healthtronix previously provided compression therapy services to patients with lymphedema and similar disorders, and had recently expanded its business to become a wound care supplier.

During their conversation, Mattimoe stated that she would likely be able to recruit clinics currently in business with MP, specifically McKees Rocks and Youngstown. Mattimoe informed Hoskins that, although her contract with MP had a non-compete clause, she did not believe the agreement was enforceable.

Ultimately, Hoskins offered, and Mattimoe accepted, a position as vice president of clinical services. In this position, Mattimoe's primary duty was "[b]ringing clinics into our office, into our business, increasing our revenue." [Doc. 27, Ex. 2]. By the end of 2007, Mattimoe had held meetings with representatives of McKees Rocks, Portsmouth and Youngstown/Warren and had successfully persuaded these clinics to work with Healthtronix.

Healthtronix also offered employment opportunities to three MP employees. Healthtronix, specifically, hired Carmen Kwolek, a medical supply specialist [MSS] at the clinic in McKees Rocks, Michele Kinkela, another MSS, at Youngstown/Warren, and Jane Ryan, likewise a MSS, at Portsmouth.

4

On August 6, 2008, Healthtronix fired Mattimoe over fundamental disagreements about the direction of the business, and social problems between her and Hoskins.

## Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id*. at 323. The burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. *Celotex, supra*, 477 U.S. at 324.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the non-moving party, all evidence will be construed in the light most favorable to the non-moving party, and all inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to

5

interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine

issue as to any material facts and that the moving party is entitled to judgment as a matter of law.

*Celotex, supra*, 477 U.S. at 323.

## Discussion

### 1. Breach of Contract

MP alleges that Mattimoe breached her employment contract's non-compete, non-solicitation

and confidentiality provisions. To allege a breach of contract claim under Ohio law, plaintiff must

establish: 1) the existence of a binding contract; 2) plaintiff's performance; 3) defendants' breach;

and 4) damage or loss as a result of such breach. *Hicks v. Bryan Med. Group, Inc.*, 287 F.Supp.2d

795, 803 (N.D. Ohio 2003); *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (1994).[2]

If a breach of contract claim involves a restrictive covenant, such as a contract not-to-

compete, the employer must also establish the contract's validity. *Raimonde v. Van Vlerah*, 42 Ohio

St.2d 21, 25-26 (1975). Courts disfavor restrictive covenants, *Clark v. Mt. Carmel Health*, 124 Ohio

App.3d 308, 314 (1997), but will find them valid if their restrictions are reasonable to protect

employers' legitimate business interests. *Brentlinger Enters. v. Curran*, 141 Ohio App.3d 640, 645

(2001).

In assessing the reasonableness of such contractual restrictions, courts consider:

> whether the covenant imposes temporal and spatial limitations, whether the
> employee had contact with customers, whether the employee possesses confidential

---

[2]

Despite the contract's choice of law provision, I apply Ohio law, as the parties agree that no material distinctions exist between the relevant law in Ohio and Florida. *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 474 (2006) (adopting the rule that "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken."). Moreover, as both parties rely on Ohio law, they have waived that contractual provision.

> information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992) (citing *Raimonde*, *supra*, 42 Ohio St.2d at 25-26).

The employer has the burden of proving the restraint reasonable and the contract valid. *Evans v. Duracote Corp.*, 13 Ohio App.2d 63, 66 (1968); *Arthur Murray Dance Studios of Cleveland v. Witter*, 62 Ohio Law Abs. 17, 30 (1952).

If a covenant imposes an unreasonable restriction, courts can modify the agreement to the extent necessary to protect the employer's legitimate interest and then enforce the covenant as modified. *Economou v. Physicians Weight Loss Centers of Am.*, 756 F.Supp. 1024, 1031 (N.D.Ohio 1991); *Raimonde, supra*, 42 Ohio St.2d at 26.

MP has established the elements required for a typical breach of contract claim. The contract is supported by consideration, as Mattimoe signed it in exchange of monetary compensation. *See Cary Corp. v. Linder*, 2002 WL 31667316, * 4 (Ohio Ct. App.) (quoting *Maint. Specialties, Inc. v. Gottus*, 314 A.2d 279, 282 (Pa. 1974) ("When the restrictive covenant is added to an existing employment relationship, however, it is only enforceable when the employee who restricts himself receives a corresponding benefit or change in status.").

Further, a jury could find that Mattimoe breached the contract's clauses. Mattimoe accepted a job at Healthtronix, in apparent violation of the contract's non-compete clause. She also solicited MP's clinics and hired three of MP's employees, likewise in apparent violation of the contract's non-solicitation clause. A jury, moreover, could find Mattimoe was aware of sensitive information

7

such as sales figures and customer information relating to MP's provision of services at the clinics and used the information in her position at Healthtronix, in violation of the contract's confidentiality clause.

Defendants challenge MP's breach of contract claim by arguing that MP has not presented any evidence of damages. *See Oak Rubber Co. v. Bank One*, *N.A.,* 214 F.Supp.2d 820, 831 (N.D. Ohio 2002) (granting summary judgment on breach of contract claim where plaintiff failed to present evidence of damages).

Here, plaintiff has sufficiently alleged that defendants recruited its customers and employees. Given that a jury could find that the defendants breached the contract's non-compete and non-solicitation clauses, it could also find that plaintiff suffered financial losses.[3]

Defendants also assert that the contract's restrictive covenants are invalid and unenforceable because they are not reasonably necessary to protect MP's legitimate business interests. The employment contract has two flaws and therefore is invalid as written.[4]

First, the non-compete clause fails to specify the type of business that it restricts Mattimoe from performing, despite including a space to do so. Without a qualifying description, the non-compete clause restricts Mattimoe from a broad range of businesses. MP is in the field of wound

---

[3]

Plaintiff has not submitted a statement of its losses. To recover at trial, it will have to prove those loses. For now, it suffices to conclude that plaintiff lost income that it otherwise would have received from the customers that defendants took from it.

[4]

The contract's duration is not unreasonable. Courts have found restrictive covenants exceeding eighteen months to be reasonable. *See Life Line Screening of Am., LTD. v. Calger,* 145 Ohio Misc.2d 6, 19 (2006) ("[T]he court finds that the two-year period specified in the agreements is reasonable. Numerous Ohio decisions have upheld contracts calling for two-year periods or longer.").

care, so the contract cannot preclude Mattimoe from engaging in business activity outside of that field. This provision, therefore, is invalid as written. *See Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 957 (D.Minn. 1999) (applying Ohio law) (finding provision without parameters on the prohibited activities was not reasonably limited to protect employer's interests).

The non-compete's geographic reach – the entire United States – is also unreasonably broad, as MP does not purport to work with clinics in every county on a nationwide basis. There is no justification for preventing her from working in the same business in areas distant from where plaintiff has a presence. The geographic scope of this contract is overbroad and unreasonable. *See Segal v. Fleischer*, 93 Ohio App. 315, 319-20 (1952) (stating that because the covenant contained no restriction as to area covered, it was not reasonably limited); *Emler v. Ferne*, 23 Ohio App. 218, 223 (1926) (invalidating a restrictive covenant because it had no geographic limit).[5]

Despite these contractual impairments, MP has a legitimate business interest which it intended to protect by contract. As one of MP's primary contacts with the clinics, Mattimoe had access to confidential information including sales figures and customer information. She had worked at MP for nearly ten years, and had no doubt, learned information valuable to a competing business.

As such, the defects do not render the contract completely unenforceable. MP's interests would still be protected by a contract with a narrower geographic and substantive scope.

MP sought to prevent its former employers from directly competing with its customer base. As such, I reform the contract's non-compete clause to prevent Mattimoe from working in the wound care field in Toledo and to travel to other states to recruit MP's customers for her own benefit

---

[5] That Mattimoe, rather than MP, filled in the contract's geographic limitation has no legal effect. What matters is the contract's terms, not which party inter-lineated some part of those terms.

and that of Healthtronix. *See Darrow v. Kolczun*, 1991 WL 35120, * 2-3 (Ohio Ct. App.) (finding that trial court correctly found the contract restricting doctor's practice in the areas of orthopaedics, orthopaedic subspecialty or hand surgery to be unlawfully broad, but remanded so court could reform contract).[6]

Mattimoe's decision to accept a position and do the work she did at Healthtronix runs afoul with the reformed and narrowed non-compete clause. She recruited customers who she knew previously did business with MP for a company in direct competition with MP. I, therefore, deny defendants' motion for summary judgement as to MP's breach of contract claim.

### 2. Misappropriation of Trade Secrets

MP claims that the defendants misappropriated trade secrets and other confidential information. The Ohio Uniform Trade Secrets Act defines misappropriation as the:

---

[6]

I am mindful of that fact that the contract's eighteen-month period expired before MP specifically sought contract reformation, so its request is, in essence, a *post facto* reformation to enable it to recover damages. Defendants have not objected to reformation on this ground, but even if they did, reformation would still be proper.

In Ohio, a non-compete contract cannot expire while its signatories litigate its enforceability. *Homan, Inc. v. A1 AG Servs., L.L.C.,* 175 Ohio App.3d 51, 58 (2008); *Trim-Line of Toledo v. Carroll*, 1987 WL 7056, * 2 (Ohio Ct. App.) (stating that the plaintiff "should not be denied the benefit of their bargain simply because the time period specified in the negative covenant all but expired while [the plaintiff] sought to enforce the contract through the court system").

The reasoning articulated in *Trim-Line* also applies in this case. MP sought to enforce the contract by filing a complaint on April 7, 2008, which was within the contract's duration. Because MP initiated litigation within the contract's pendency, it should be free to seek reformation during the litigation, as the contract cannot expire during litigation.

Such *post facto* reformation would not be any more unjust to the breaching party as reformation of an invalid contract after its breach, an action courts regularly perform. *See, e.g., Darrow*, *supra*, 1991 WL 35120, at * 4 (reforming contract after breach occurred).

1)     [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

2)     [d]isclosure or use of a trade secret of another without the express or implied consent of the other person by a person who . . . [u]sed improper means to acquire knowledge of the trade secret, [a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use, [or b]efore a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.R.C. § 1333.61(B)

A trade secret is information that derives independent economic value, actual or potential, from not being generally known to or ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts reasonable under the circumstances to maintain its secrecy. *Id*. at (D).

In Ohio, courts determine whether a trade secret exists by examining the following factors:

(1) [t]he extent to which the information is known outside the business; (2) the extent to which [the information] is known to [employees] inside the business * * *; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 986 (N.D.Ohio 2008) (quoting *State ex rel. Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524-25 (1997)).

MP claims that while in its employ, Mattimoe had access to sales reports, customer lists, a profitability matrix and "wound care decision tree," and that, after leaving its employ, Mattimoe misappropriated this information.

11

The record indicates that Mattimoe relied on this information in her employment with Healthtronix. The relevant question then, is whether this information constitutes a trade secret.

For the following reasons, I conclude that MP has established a genuine issue of material fact as to whether its sales reports, profitability matrix and customer lists are trade secrets, but has not done the same for its wound care decision tree.

Customer lists can, under Ohio law, constitute trade secrets. *Merrill Lynch, Pierce, Fenner & Mattimoe, Inc. v. Kramer*, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992) (holding that a customer list may be a trade secret and that there is a presumption of secrecy regarding such a list when the owner takes measures to keep it from being available to others); *Consumer Direct, Inc. v. Limbach*, 62 Ohio St. 3d 180, 183 (1991) (stating that a customer list is an intangible asset that an owner may keep from its competitors).

Defendants argue that MP's customer list is not a trade secret because it is readily ascertainable. They assert that anyone can determine the list by simply calling hospitals and clinics and asking about their wound care providers.

Given the geographic breadth of MP's customer base, however, developing such a list would require a large investment of time and resources. This situation at bar is not one where someone could easily determine MP's customer list by calling a handful of clinics in the local phone book. *See ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts*, *Inc*., 402 F.3d 700, 714 (6th Cir. 2005) (internal citations omitted) (distinguishing between customer lists "discoverable only through extraordinary efforts and  .  .  .  through many years' expenditure of time and money  .  .  .  [and] lists of customers whose identities  .  .  .  may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses" when determining which

12

is a trade secret).

Here, a jury could find MP's customer lists, profitability matrix and sales report to be trade secrets. MP advised Mattimoe that this information was not widely disseminated within the company, and is only disclosed to employees with a specific business need for such information. Mattimoe, herself, did not have access to this information before working as clinical services manager, even though she had worked as an MP employee for numerous years.

This information, further, was not intended for outside use. MP also took reasonable steps to protect this information, as illustrated by its requiring Mattimoe to sign a confidentiality agreement.

Because MP's customer list, profitability matrix and sales reports are not widely available, note the specific needs of each customer and MP's pricing and marketing strategies for each customer, this information derives independent economic value and would be valuable to MP's competitors.

MP's wound care decision tree, however, is not a trade secret. First, it is based on the Medicare Coverage Criteria Necessity, which are clinical guidelines generally known within the wound care industry.

Assuming arguendo that the wound care decision tree once qualified as a trade secret, the tree lost such status because MP publically displayed it at conferences for wound care suppliers. As soon as MP displayed the tree to the public, any claim that it might have had for misappropriation became moot, as such tree is no longer a trade secret. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his

13

property right is extinguished."); *State ex rel. Rea v. Ohio Dep't of Educ.*, 81 Ohio St. 3d 527, 532 (1998)) ("once material is publicly disclosed, it loses any status it ever had as a trade secret.").

I, therefore, grant summary judgment as to MP's claim that defendants misappropriated its wound care decision tree, but deny it as to the sales report, customer lists and profitability matrix.

### 3. Unjust Enrichment

MP claims that defendants were unjustly enriched when Healthtronix hired three former MP employees, discovered MP's trade secrets and entered into contracts with MP's former clinics.

To bring an unjust enrichment claim under Ohio law, plaintiff must produce evidence that: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (internal citations omitted) (citing *Brown-Graves Co. v. Obert*, 98 Ohio App. 3d 517, 523 (1994)).

"The word 'confer' means 'to bestow from or as if from a position of superiority' or 'to give.' *See MPW Indus. Servs., Inc. v. Pollution Control Sys., Inc.*, 2006 WL 640438, * 9 (S.D. Ohio 2006) (citing Merriam-Webster OnLine dictionary, http://www.m-w.com/dictionary/confer, last visited 8/19/09).

Here, MP's claim fails because it did not confer or voluntarily bestow a benefit on defendants. Instead, defendants took clients, employees and arguably trade secrets from plaintiff. *See id.* (distinguishing between the voluntary bestowing of a benefit with the involuntary taking of it).

### 4. Tortious Interference with Contract and Business Relationship

MP also brings claims for tortious interference with contract and business relationships. In support of both claims, MP asserts that defendants recruited its former customers and employees and convinced them to sever relationships with MP. MP contends that defendants acted with knowledge of, and in violation of, Mattimoe's contract.

The Ohio Supreme Court formally recognized the tort of interference with contract in *Kenty v. Transamerica Premium Ins.* Co., 72 Ohio St.3d 415, 418 (1995). The same year, the Court expanded this tort to protect against interference with business relationships. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995).

The basic principle of a "tortious interference" action is that "one, who is without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." *Barilla v. Patella*, 144 Ohio App.3d 524, 532  (2001); *see A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995).

In Ohio, to establish the tortious interference with contract or a business relationship, plaintiff must provide evidence of: 1) a business relationship or contract; 2) defendants' knowledge thereof; 3) defendants' intentional action taken to prevent contract formation, procure contractual breach or terminate a business relationship; 4) lack of privilege [or justification]; and 5) resulting damages. *Parker v. Rice*, 2009 WL 223886, * 3 (Ohio Ct. App.); *Brookside Ambulance, Inc. v. Walker Ambulance Serv.*, 112 Ohio App.3d 150, 156-57 (1996).

In light of the fourth element, "[o]nly improper interference with a contract is actionable." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 (1999). When considering whether defendants' conduct was improper, courts assess:

15

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the
> other with which the actor's conduct interferes, (d) the interests sought to be
> advanced by the actor, (e) the social interests in protecting the freedom of action of
> the actor and the contractual interests of the other, (f) the proximity or remoteness
> of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 178-79 (citing 4 Restatement of the Law 2d, Torts (1979) 26-27, Section 767); *see also*

*Brookeside Ambulance*, *supra.*, 112 Ohio App.3d 150, 157 (1996) (applying factors in context of

tortious interference with business relationships).

MP has sufficiently established the requisite elements for both of its tortious interference

claims. The record shows that Mattimoe and Healthtronix knew that MP had a business relationship

with the clinics in McKees Rocks, Portsmouth, and Youngstown/Warren. Defendants also knew that

MP and Mattimoe had a contract with a non-compete clause, as Mattimoe disclosed this information

during her interview with Hoskins.

Defendants argue that MP has not provided evidence that intentionally acted. I disagree: a

jury could find that Mattimoe and Healthtronix acted intentionally and without justification in

recruiting MP's former clinics and employees, and encouraging them to terminate their relationships

with MP. Mattimoe contacted these clinics with knowledge of their customer profiles. She held

meetings with McKees Rocks, Portsmouth and Youngstown/Warren and successfully persuaded

these clinics to work with Healthtronix. Additional evidence comes from the fact that Healthtronix

hired Mattimoe to "[b]ring[] clinics into our office, into our business, increas[e] our revenue." [Doc.

27, Ex. 2].

A reasonable jury could also find that Mattimoe and Healthtronix acted intentionally in

interfering with MP's employment contract. Both defendants had knowledge of this contract and

without justification, they assumed it to be unenforceable and acted with disregard to its potential

16

validity. Despite the court's authority to reformulate an otherwise invalid contract, the defendants carried on as if the contract did not exist.

Defendants also argue that MP has failed to produce evidence of its damages. MP has, however, demonstrated that due to defendants' actions, MP lost three of its former employees and three of its relationships with former clinics. No more is necessary at this stage.

I, therefore, deny summary judgment on plaintiff's claim of tortious interference with business relationships and contract.

### 5. Inevitable Disclosure Doctrine

MP also asserts a claim for injunctive relief based on the inevitable disclosure doctrine. This doctrine states that where an employee with detailed, comprehensive knowledge of an employer's trade secrets and confidential information begins employment with a competitor in a substantially similar position, her disclosure of trade secret information is inevitable. *Berardi's Fresh Roast Inc. v. PMD Enters., Inc*., 2008 WL 4681825, * 4 (Ohio Ct. App.).

The doctrine establishes a threat of harm sufficient to warrant injunctive relief preventing defendant from entering an employment situation which would lead to the "inevitable disclosure" of confidential information. *Hydrofarm, Inc. v. Orendorff,* 180 Ohio App.3d 339, 344 (2008); *Berardi's Fresh Roast, supra*, 2008 WL 4681825, at * 4.

MP invokes this doctrine to support its request for injunctive relief. As of August 6, 2008, however, Mattimoe no longer works for Healthtronix. MP's request for injunctive relief, therefore, is moot, and fails as a matter of law.

17

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT defendants' motion for summary judgment [Doc. 21] be, and hereby is granted in part and denied in part as provided herein.

A scheduling conference is set for September 21, 2009 at 4:30 pm.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

18